UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X          Docket No.: 16 CIV. 00607 (KMK)

KEVIN P. MAHER,

                                        Plaintiff,

          -against-


TOWN OF STONY POINT,

                                        Defendant.
-------------------------------------------------------------X


**MEMORANDUM OF LAW IN OPPOSITION OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56**


Kevin T. Conway, Esq.
Attorney for Plaintiff
664 Chestnut Ridge Road
Spring Valley, NY 10977

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................... ii

PRELIMINARY STATEMENT.............................................................. 1-2

STATEMENT OF FACTS...................................................................... 2-15

    Town Supervisor Geoffrey Finn's Statements Raise
    Genuine Issues of Material Facts to be Tried............................................ 4

    Councilman Thomas Basile's Statements Raise
    Genuine Issues of Material Facts to be Tried............................................ 5-6

    Councilman Karl Javenes' Statements Raise
    Genuine Issues of Material Facts to be Tried............................................ 6-7

    Supervisor James Monaghan's Statements Raise
    Genuine Issues of Material Facts to be Tried............................................ 8-9

    Councilman James White's Statements Raise
    Genuine Issues of Material Facts to be Tried............................................ 9

    Additional Material Facts Which Raise Genuine Issues to be Tried.......... 9-15

ARGUMENT........................................................................................ 15-30

I.    Summary Judgment should be denied as there are, at
    the very least genuine issues of material facts to be tried............................ 15

II.    The Town Retaliated Against Mr. Maher for Engaging in
    First Amendment Protected Speech.................................................. 15-28

    A.   Mr. Maher has demonstrated a prima facie case of a First
      Amendment Retaliation claim............................................... 16-20

    (i)   There is direct evidence of retaliatory animus................................. 16-17

    (ii)  The temporal relationship proximity is, at the very least, sufficient............ 18-20

    B.  The Town's Contention that it terminated Mr. Maher and hired Lanc
      & Tully for economic reasons and for the $600 million waste-to-biofuels
      plant is pretext and a ruse.................................................. 20-28

III.   Mr. Maher's New York State Law whistleblower claim should not be
    Dismissed.................................................................................. 29-30

CONCLUSION........................................................................................ 31

## TABLE OF AUTHORITIES

*Feingold v. State of New York et al.*
366 F.3d 138 (U.S. Ct. of Appeals 2004)..................................................................... 15

*Scaria v. Rubin*
117 F.3d 652, 653 (2d Cir.1997)
(per curiam)................................................................................................................. 15

*Celotex Corp. v. Catrett*
477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)....................................... 15

*Stern v. Trustees of Columbia Univ.*
131 F.3d 305, 312 (2d Cir.1997)................................................................................. 15

*Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*
274 F.3d 683, 685 (2d Cir.2001)
(per curiam.................................................................................................................. 15

*Abdu–Brisson v. Delta Air Lines, Inc.*
239 F.3d 456, 466 (2d Cir.2001)................................................................................. 15

*Mandell v. County of Suffolk,* 316 F.3d 368, 377 (2d Cir.2003) (quoting *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000))........................................................................ 15

*Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County,*
252 F.3d 545 (2004)................................................................................................... 18

*Benedict v. Town of Newburgh et al.*
125 F.Supp.2d 675 (U.S. Dist. Ct. SDNY 2000)........................................................ 20

*Hurdle v. Board of Ed. City of New York et al.*
(2002 WL 3183 4454).................................................................................................. 20

*People v. Rafalowitz*
43 Misc.3d 1232(A) (Dist. Ct. Nassau Cty NY 2014)................................................. 30

<u>Statutes</u>

Fed.R.Civ.P. 56(c)........................................................................................................ 15

NY Civil Service Law § 75-b........................................................................................ 29

Town of Stony Point Code Chapter 215, Article IV, Section 23C................................. 29-30

## PRELIMINARY STATEMENT

Defendant, Town of Stony Point's (hereinafter referred to as "the Town") Motion for Summary Judgment should be denied because at the very least genuine issues of material fact exist.  The Plaintiff, Kevin P. Maher (hereinafter referred to as "Mr. Maher") initiated this whistleblower action against the Town in the Supreme Court, State of New York, County of Rockland.  Mr. Maher was the Town Engineer from 2009 until his unlawful retaliatory termination on January 13, 2015.

Prior to his termination, Mr. Maher brought an Article 78 Proceeding against the Town's Zoning Board of Appeals (hereinafter referred to as "the ZBA"), it's members and the Chief Building and Zoning Inspector before the Supreme Court, County of Rockland, State of New York, Index Number 400-2014. In said proceeding, Mr. Maher sought to have annulled a determination by the ZBA finding that Mr. Maher had no standing to appeal from a determination by the Town's Building/Zoning Inspector, William J. Sheehan (hereinafter referred to as "Building Inspector Sheehan").  Building Inspector Sheehan withdrew and/or rescinded a violation involving issues relating to an alleged dangerous roadway intersection, located in the Town of Stony Point.

On or about October 30, 2014, the aforesaid Court ruled in favor of Mr. Maher and ordered that the matter was remitted to the ZBA for further proceedings.  The Town appealed the Decision staying all proceedings.  On or about January 7, 2015, Mr. Maher sought to put the appeal back on before the ZBA.

The facts set forth in Mr. Maher's Response and Objections to Defendant's Statement Pursuant to Local Rule 56.1 (which are also addressed below) demonstrate the following: that there was retaliatory animus on the part of the Town as against Mr. Maher; that notwithstanding

that the Second Circuit has not drawn a bright line to define the outer limits of the temporal relationship between the protected speech and the adverse employment action, the Town artificially inflated same; that the Town's claim that Mr. Maher was terminated for economic reasons and the New Planet Energy project is a pretext; that the Town artificially lowered and disguised the cost of the outside engineering firm hired to replace Mr. Maher; and that Building Inspector Sheehan did engage in improper government action.

Based on the foregoing, along with the genuine issues of material fact and the legal arguments set forth below, the Town's Motion for Summary Judgment should be denied in its entirety.

## STATEMENT OF FACTS

It is uncontested that this matter stems from Mr. Maher's challenge of the Town's Building Inspector Sheehan's decision to rescind a violation which charged a dangerous roadway condition.   Mr. Maher was terminated as a result of same and there is direct evidence of retaliatory animus.  Councilman Javenes conceded that he went to Mr. Maher's house to discuss the Article 78 proceeding; (DKT 23 Exh. U 44:4-12).   During the aforesaid discussion, Councilman Javenes stated "[the Article 78 proceeding] is not going to benefit you or the Town. Definitely not."   Councilman Javenes also stated "think about what's going to benefit you and the Town, because you are employed by the Town."  He also stated "you are not going to get anywhere by doing what you're doing.  It is only going to make things worse." (Exhibit C)

Building Inspector Sheehan, who has been in the aforesaid appointed position for over 31 years (DKT 23 Exh. N 5:10-15), refers to Town Supervisor Finn merely by "number 9" and "just another supervisor" (DKT 23 Exh. N 83:18-19).  When he was advised by Supervisor Finn that they were thinking of getting rid of Mr. Maher and asked to interview his replacement, Building

Inspector Sheehan said, "it's about time" (DKT 23 Exh. N 85:6-9).  Also, it was Building Inspector Sheehan who took part in interviewing Mr. Maher's replacement "just prior to" Mr. Maher's termination (DKT 23 Exh. N 61:23-25) and who recommended Lanc & Tully, the engineering firm that was hired because it was "a small firm" (DKT 23 Exh. N 68:10-14).

Yet, the small firm of Lanc & Tully was hired despite the fact that the Town's entire defense is premised on the purported economic benefit of hiring an outside engineering firm that "would be better equipped to work on the $600 million construction project of a waste-to-biofuels plant in the Town" (DKT 22 pg. 15 of the Town's Memorandum of Law).  Also, the small firm of Lanc & Tully was hired pursuant to Building Inspector Sheehan's recommendation, notwithstanding that Board Member Javenes testified that Mr. Maher was terminated because the Town needed the services of a "big firm" (DKT 23 Exh. U 60:2-3).

Notwithstanding that Supervisor Finn toes the party line, he sided with Building Inspector Sheehan against Mr. Maher and was quoted in an interview with a newspaper as follows: "The Town Board has officially chosen to back Sheehan and the Zoning Board on the matter … [Supervisor Finn] stated the town had faith in the decision-making process of the board and considered the suit an unwarranted 'waste of taxpayer money'" (Exhibit "I").

Also, notwithstanding that the Town's theme throughout its motion is that Mr. Maher was terminated and Lanc & Tully was hired in order to work on the New Planet Energy Project, a recent FOIL Request to the Town seeking the names and addresses of all consulting firms retained on behalf of the Town to review and comment on the New Planet Energy Project, which is currently proposed for the end of Holt Drive elicited the following e-mail response from the Town on September 20, 2017: "as of this date no consulting firms have been retained" "Planning Board" (see Exhibits C and J).

## Town Supervisor Geoffrey Finn's Statements Raise Genuine Issues of Material Facts to be Tried

Supervisor Finn disliked Mr. Maher (See Exh. C).  As set forth above, Mr. Finn and the Town Board sided heavily with Building Inspector William Sheehan, who sat in on the interviews to replace Mr. Maher and who recommended the outside engineering firm which was hired because it was "a small firm".

Notwithstanding that the Town purports its basis for terminating Mr. Maher was the New Planet Energy Project,  Supervisor Finn testified that "I don't have the dates…" when the new planet energy project was discussed and when asked how far back the discussion was he also said, "I don't know…" (See DKT 23 Exh. S 39:4-11).  Supervisor Finn also testified that he did not know the date that it was discussed to replace Mr. Maher and that the budget was passed including Mr. Maher's position prior to the decision to solicit outside engineering firms (See DKT 23 Exh. S pg. 45:17-25 pg. 46:1-11).

Supervisor Finn further testified that he made no comparison of the services provided by Mr. Maher to the services to be provided by the outside engineering firm.  Mr. Finn also testified that he did not know what Mr. Maher did on an hourly or daily basis (See DKT 23 Exh. S pg. 50:25-51-52:1-24).

Contrary to the Town's position, Board Member Karl Javenes testified that Supervisor Geoffrey Finn was either the one who was spearheading the effort or presenting the effort to have Mr. Maher's position eliminated and hire the outside firm (See DKT 23 Exh. U pg. 22:2-25-23:2-10).

4

## Councilman Thomas Basile's Statements Raise
## Genuine Issues of Material Facts to be Tried

Councilman Basile testified that he did not recall if other than terminating the Town Engineer and hiring an outside firm, if there were other departments that the Board was talking about "advancing" (See DKT 23 Exh. T pg. 16:9-25-17:2-3).   Mr. Basile also testified that no other positions have been eliminated since Mr. Maher's position (See DKT 23 Exh. T pg. 38:19-22).

Councilman Basile testified that at the time the decision was made to terminate Mr. Maher's position and hire an outside firm no formal fiscal analysis was done to determine whether same generated a cost savings (See DKT 23 Exh. T pg. 19:14-18). Mr. Basile testified that [notwithstanding that Brian Nugent, Esq. of the "outside law firm" drafted the Resolution abolishing Mr. Maher's position using his firm as the only example of ("privatization") and cost savings (See DKT 23 Exh. F)], no assessment was done to determine whether or not the Resolution (See DKT 23 Exh. F) drafted by Mr. Nugent was accurate or cost saving (See DKT 23 Exh. T pg. 39-38-pg. 28:2-7).

Also, notwithstanding that the Resolution (See DKT 23 Exh. F) specifically stated that the Board considered the "volume of engineering work in the Town", Councilman Basile testified that he did not determine or inquire or had presented to him the daily or weekly function or special task functions that Mr. Maher did on a regular basis (See DKT 23 Exh. T pg. 16:3-8).  Councilman Basile testified that he was never presented with a financial analysis as to whether or not eliminating the Town Engineer position and hiring an outside firm actually saved money (See DKT 23 Exh. T pg. 31:2-20).

Councilman Basile voted to terminate Mr. Maher on January 13, 2015 (See DKT 23 Exh. F) less than six days after Mr. Maher, by way of a letter (Exh. A), requested to appear once again before the ZBA to have his appeal heard of Building Inspector Sheehan's decision to rescind the violation pertaining to a dangerous intersection.   The Town's lawyer Mr. Nugent (who is carbon copied on Exh. A) drafted the Resolution terminating Mr. Maher, using Mr. Nugent's firm as the only example of alleged cost savings.   Yet, no analysis or discussion was done prior to voting on said Resolution as to whether or not Mr. Nugent's representation was true (See DKT 23 Exh. S, par. 69:5-21).

Councilman Basile, who is also an attorney, purports that Mr. Maher's issues with the ZBA was "personal", notwithstanding that it is undisputed that Mr. Maher was actually denied standing by the ZBA as a Town Officer employed as the Town Engineer.   It is also undisputed that said ZBA decision was overturned by the Supreme Court.   It is also undisputed that Mr. Basile voted to terminate Mr. Maher on January 13, 2016 (See DKT 23 Exh. F) less than six days after Mr. Maher requested to have the ZBA hear his appeal of Building Inspector's Sheehan's decision to rescind a violation imposed by another Building Inspector (See Exh. A). Moreover, Mr. Basile (who testified at length to at least 15 years of local county, State and Federal government experience which including in the administrations of Senator Trent Locke and President George W. Bush) purportedly never inquired further about the merits of the Article 78 action which involved a safety issue at a Town intersection (See DKT 23 Exh. T pg. 53:2-10).

### Councilman  Karl Javenes' Statements Raise Genuine Issues of Material Facts to be Tried

Mr. Maher and Councilman Javenes [a "Construction Supervisor" (See DKT 23 Exh. U 5:9-12)] are not friends.   Councilman. Javenes was upset with Mr. Maher when Mr. Maher

refused to endorse a construction plan Councilman Javenes (while a Board Member) presented to Maher from a private engineering firm.  Councilman Javenes conceded that he went to Mr. Maher's house to discuss the Article 78 proceeding; yet, he did not recall when (DKT 23 Exh. U 44:4-12).  During the aforesaid discussion, Councilman Javenes stated "[the Article 78 proceeding] is not going to benefit you or the Town.  Definitely not." Councilman Javenes also stated "think about what's going to benefit you and the Town, because you are employed by the Town." He also stated "you are not going to get anywhere by doing what you're doing.  It is only going to make things worse." (Exhibit C)

When asked how much the Town would save Councilman Javenes testified "I'm not 100% sure" (See DKT 23 Exh. U pg. 10:13-15).  Also, notwithstanding that the Resolution (See DKT 23 Exh. F) stated that the Board, in terminating Mr. Maher, considered the "quality and quantity" of engineering services provided by a private engineering firm and the volume of engineering work in the Town, Councilman. Javenes testified that no written comparison was done comparing the scope of work between the outside engineering firm and Mr. Maher.  No one asked Mr. Maher what he did on an hour, weekly or daily basis (See DKT 23 Exh. U, pg. 20:20-25 and pg. 25:4-9).

Also, notwithstanding that Councilman Javenes testified that the Town needed the services of "a big firm" (See DKT 23 Exh. U pg. 60:2-3), Building Inspector Sheehan, who gave his opinion to the Town Board and Supervisor Finn to hire Lanc & Tully (the outside firm hired), did so because it is "a small firm" (See DKT 23 Exh. N pg. 68:3-14).

## Supervisor James Monaghan's Statements Raise
## Genuine Issues of Material Facts to be Tried

Supervisor Monaghan testified that he did not know specifically what date or when it was discussed to eliminate the Town Engineer position (See DKT 23 Exh. W, pg. 42:23-25-43:2-6). The audio of the alleged Town Board Meeting of October 28, 2014 does not include any statements referencing the elimination of the Town Engineer position (See DKT Exh. R) and the Town's attorney Randazzo concedes same in his e-mail (see Exh. D annexed hereto). Also, Board Member James White, who sponsored the Resolution eliminating the Town Engineer position, and who made the motion sponsoring same (See DKT 23 Exh. X, pg. 21:11-17), testified that there was never a discussion at a public meeting to eliminate the Town Engineer position (See DKT 23, Exh. X, pg. 22:19-25-23:2-25). There is no testimony as to when the Town received the "proposals".

Supervisor Monaghan also testified that he never did an analysis comparing the duties performed by Mr. Maher and the duties performed by the outside engineering firm and did not know what duties each performed (See DKT 23 Exh. W pg. 65:20-25-pg 66:2-3 and pg. 67:2-9).

Supervisor Monaghan also testified that he did not do an analysis comparing the functions of the outside engineering firm with those of Mr. Maher (See DKT 23 Exh. W pg. 65:20-25 pg. 66:2-3). Also, Building Inspector Sheehan, who gave his opinion to the Town Board (it is undisputed that Monaghan was a Board Member at the time) to hire Lanc & Tully did so because "it is a small firm" (see DKT 23 (Exh. N   68:3-14).

Notwithstanding that it is the Town's position (in order to distance itself from the whistleblowing) that Supervisor Monaghan (who was not only a Town Board Member, Town

8

Supervisor, a retired New York City Police Lieutenant and a retired bus driver for the Haverstraw Transit Bus Company (See DKT 23 Exh. W pg. 6:2-7), didn't take a big interest in [the Article 78 proceeding] and that it "wasn't a big deal" (DKT 24 page 129), testified that he had a bus route along the dangerous intersection at issue and that is was an unsafe condition with overhanging bushes and he agreed that they should be cut (See DKT 23 Exh. W pg. 19:13-25-pg 20:2-19).

<b>Councilman James White's Statements Raise<br>Genuine Issues of Material Facts to be Tried</b>

Councilman White (who, as aforesaid, sponsored the Resolution terminating Mr. Maher) testified that the Town Board Members' discussions related to "eliminate the position" was talked about in "generic terms" and there was never a discussion about Mr. Maher's position (See DKT 23 Exh. X pg. 22:9-25-pg. 23:2-15). Also, Councilman White voted to hire Mr. Maher in place of an outside engineering firm in order to save costs (See DKT 23 Exh. X pg. 6:4-11).

When Councilman White was asked if he or the Town Board analyzed the cost of employing a Town Engineer compared to engaging an outside engineering firm prior to eliminating the Town Engineer position, he answered "yes and no" (See DKT 23 Exh. X pg. 27:11-20). Also, when Councilman White was asked if there was a financial analysis, he testified "no" (See DKT 23 Exh. X pg. 28:6-13).

<b>Additional Material Facts Which Raise Genuine Issues to be Tried</b>

Mr. Maher was terminated on January 13, 2015 less than six days after he, by way of a letter (Exh. A), requested to appear back before the ZBA to have his appeal heard of Building Inspector Sheehan's decision to rescind the violation pertaining to a dangerous intersection. Also, the Town's lawyer Mr. Nugent (who is carbon copied on Exh. A) drafted

9

the Resolution terminating Mr. Maher, using Mr. Nugent's firm as the only cost savings example).   No analysis or discussion was done prior to voting on said Resolution as to whether or not Mr. Nugent's representation was true (See DKT 23 Exh. S, par. 69:5-21).

During Mr. Maher's tenure as the Town's Engineer, he attended numerous Planning Board Meetings each year as part of his job duties and as the custom and practice of the Town. Mr. Maher has reviewed the Town's Planning Board Minutes for 2015 and 2016 (Exhibit E) and based on his experience and background as an engineer and the custom of the Town Engineer, the aforesaid Minutes reflect that an engineer from Lanc & Tully attended and participated in at least 14 meetings.   Generally, the Planning Board Meetings would last approximately 3.5 hours and industry standards would permit Lanc & Tully to charge for its one-hour commute to said meetings (Exhibit C).

Also, based on Mr. Maher's experience and background as an engineer and as the Town Engineer, it was the custom and practice for the Town Engineer to attend Technical Advisory Committee ("TAC") meetings ahead of each Planning Board Meeting in preparation for same. Generally, the TAC meetings would last approximately two hours; and it would be the custom and practice for Lanc and Tully to charge for its commute (Exhibit C).

Mr. Maher also reviewed the Town of Stony Point Account QuickReports for January through December 2015 and 2016 (DKT 23 Exhs. AA and BB, respectively) (the only documents relied upon by the Town for its purported cost-savings claim).   Based on his experience and background as an engineer and as the Defendant Town's Engineer, Mr. Maher determined that the aforesaid Account QuickReports artificially lower the engineering services and costs thereof, as said Reports do not include Lanc & Tully's participation and services related to all of the Planning Board Meetings and preparation for same (Exhibit C).

Also, the Town has failed to include in its economic assessment of the engineering services or the engineering costs incurred by the Planning Board.  Mr. Maher has reviewed the actual budgets for 2015 through 2017 and the proposed budget for 2018 (Exhibit G).  As such, since his firing, the Planning Board expenses have doubled or tripled to approximately $70,000, $60,000 and $40,000.00 (budgeted amount for 2017) per year.  Also, the Planning Board fees have more than doubled or tripled since his firing to approximately $130,000, $100,000 and $150,000 (budgeted amount for 2017) per year.   Based on Mr. Maher's experience and background as an engineer and as the Town's Engineer, the aforesaid expenses and fees are a direct indicator of engineering costs, same of which have not been included in the Account QuickReports (DKT 23 Exhs. AA and BB) (again, the only documents relied upon by the Defendant for its purported costs-saving claim) (Exhibit C).

Also, the Town, by merely relying on the Account QuickReports (DKT 23 Exhs. AA and BB) are hiding, disguising and/or are artificially lowering the engineering services and costs thereof by failing to advise this Court that the Sewer Department has also incurred engineering expenses following Mr. Maher's termination (which it did not have prior thereto) in the amounts of approximately $17,000 and $15,000 per year for 2015 and 2016, respectively.  There is no current reporting of Sewer Department engineering costs for 2017.

The Town has also failed to reveal that the Highway Department incurred engineering costs of approximately $2,000 in 2016.  There are no reported Highway Department engineering costs for 2017, but there is an estimate of approximately $1,000 for 2018.  The aforesaid costs are reflected in the Town's Budget which is available on the Town's website and annexed hereto as Exhibit G (see also Exhibit C).

Also, notwithstanding that former Supervisor Geoffrey Finn testified that one of the reasons Mr. Maher was fired and Lanc & Tully was hired, was for a sewer project (DKT 23 Exh. S pig 38:13-18 and 39:22-25), Mr. Maher was told by Carl Kilpatrick, Assistant Treatment Plan Operator, that upgrades were not done on the Town's waste water treatment plan because Lanc & Tully did not have the experience.  Also, contrary to Mr. Finn's opinion, Mr. Maher advised Mr. Finn that he did have the experience for the aforesaid job (Exhibit C).

The Town's reliance on the New Planet Energy project, as the reason for Mr. Maher's termination, is a ruse and a pretext.  New Planet Energy is a proposed "waste-to-energy" plant proposed for the end of Holt Drive in Stony Point.  The site is the former INSULX paint production/warehouse site and is also a site where "agent orange" was produced.  The New Planet Energy project at best is in its infancy stage (Exhibit C).  The New York State Department of Environmental Conservation was and still remains the lead agency under SEQRA; hence, the Town has provided very little engineering services to date.

The major theme throughout the Town's Motion for Summary Judgment and the alleged basis upon which Mr. Maher was terminated, is that Lanc & Tully was hired to work on the New Planet Energy project.  Yet, if the project ever comes to fruition, Lanc & Tully, as conceded by Building Inspector Sheehan, is a "small firm" (DKT 23 Exh. N pg. 6:13-16) and, according to Lanc & Tully's own pronouncement on their web page "a consulting firm specializing in civil engineering and surveying, including municipal engineering, land planning and development", they would not be qualified to review and comment on such a complex project.  Therefore, if the Town needs an opinion on the proposed plan's operations, they would need to hire other consultants to offer opinions.  Also, from their web page, Lanc & Tully does not have traffic

engineering experience so traffic impacts caused by the project would need to be addressed by a separate traffic engineer (Exhibit C).

In addition, Mr. Maher disputes the self-serving statements made by former Supervisor Geoffrey Finn that he did not dislike Mr. Maher, the opposite is true. Supervisor Finn was also quoted in a newspaper article taking sides as follows: "The Town Board has officially chosen to back Sheehan and the Zoning Board on the matter … [Supervisor Finn] stated the town had faith in the decision – making process of the board and considered the suit an unwarranted 'waste of taxpayer money'" (see also Exhibit C and Exhibit I).

Mr. Maher disputes Board Member Karl Javenes' statement that he is a friend; they are not. In fact, Mr. Javenes was upset with Mr. Maher because he refused to endorse a construction plan presented to Mr. Maher by Mr. Javenes that was prepared by a consultant engineering firm. Also, Mr. Javenes came to Mr. Maher's home during the pendency of the Article 78 proceeding (DKT 23 Exh. U 44:4-12) and threatened his job if he did not drop the case. Mr. Javenes stated in sum and substance as follows: "[the Article 78 proceeding] is not going to benefit you or the Town. Definitely not." … "think about what's going to benefit you and the Town, because you are employed by the Town" … "You are not going to get anywhere by doing what you are doing. It is only going to make things worse" (Exhibit C).

Mr. Maher disputes the Town's position that he delayed the underlying proceeding(s). Brian Nugent, Esq. of Ferrick, Lynch, MacCartney & Nugent, the outside counsel for the town, filed a Notice of Appeal on December 5, 2014, which pursuant to CPLR 5519(a)(1), stayed all proceedings and Mr. Nugent enforced that stay prohibiting Mr. Maher from getting his appeal application back before the ZBA (See the Notice of Appeal which is annexed hereto as Exh. B and/or Nugent letter annexed hereto as Exh. H.) Notwithstanding

13

the stay, Mr. Maher did try to put the matter back on by letter dated January 7, 2015 (Exh. A). Mr. Maher was terminated no more than six days later on January 13, 2015.

Mr. Maher also disputes the Town's position that his claim is limited to Building Inspector's mere violation of the "Coon series". Mr. Maher, in his Complaint (DKT 23 Exh. A) alleged that Building Inspector Sheehan's violated the Defendant's policy, rules, regulations and procedures including the New York State Zoning Enforcement Procedures including the [Coon series]". Additionally, Mr. Maher alleged in his Complaint that "Building Inspector [Sheehan] withdrew and/or rescinded a violation involving issues relating to an alleged dangerous roadway intersection located in the Town of Stony Point…The Town Building Inspector, wrongfully rescinded and/or withdrew a violation by a property owner(s) in the Town of Stony Point relating to Chapter 215, Article IV, Section 23 C of the Defendant Town Code…The aforesaid Building Inspector violated the aforesaid Defendant's rules by failing to pursue violations of the law and/or Defendant Town Code without undue bias for or against a particular person(s); which creates and presents a substantial and specific danger to the Public health or safety, including a dangerous roadway condition…" (DKT 23 Exh. A).

Also, when Mr. Maher was asked what specific rule or regulation or procedure that he could cite that the Building Inspector violated by rescinding and withdrawing the notice, he stated as follows: "I would have to – I don't have the code memorized so I would have to look through it and actually give it to you." (DKT 23 Exh. H 121:5-12).

Mr. Maher was never asked by anyone from the Town prior to, or at the time the decision was made to terminate him as to the following: what he did on a daily, hourly or weekly basis;

what special tasks he performed; or to compare the aforesaid to an outside engineering firm (Exhibit C).

## **ARGUMENT**

### I. **Summary Judgment should be denied as there are, at the very least, genuine issues of material fact to be tried**

As demonstrated by Mr. Maher's response to the Town's Local Rule 56.1 Statements and the Statement of Facts set forth above, at the very least, genuine issues of material fact exist regarding all arguments that the Town raises in its Summary Judgment Motion.  Also, virtually all of the Town's Local Rule 56.1 Statements are in dispute.  The Court in <u>Feingold v. State of New York et al.</u>, 366 F.3d 138 (U.S. Ct. of Appeals 2004) held as follows:

> "This court reviews grants of summary judgment *de novo. Scaria v. Rubin,* 117 F.3d 652, 653 (2d Cir.1997) (per curiam). Summary judgment is only warranted upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to establish the absence of any material factual issues. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether there are genuine issues of material fact, we are "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 312 (2d Cir.1997). We may only affirm if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief." **\*149** *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 685 (2d Cir.2001) (per curiam) (internal formatting omitted). Although "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001), "[i]n discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in favor of an employer sparingly because 'careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.' " *Mandell v. County of Suffolk,* 316 F.3d 368, 377 (2d Cir.2003) (quoting *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000))."

## II.  The Town Retaliated Against Mr. Maher for
## Engaging in First Amendment Protected Speech

**A.**  **Mr. Maher has demonstrated a prima facie case of a First Amendment retaliation claim**

**(i)**  **There is direct evidence of retaliatory animus**

It is uncontested that Mr. Maher engaged in protected First Amendment activity and that he suffered an adverse employment action.  Yet, contrary to the Town's position, there is a causal connection between the protected activity and the adverse action; or at the very least genuine issues of material fact exist regarding same.

It is uncontested that this matter stems from Mr. Maher's challenge of the Town's Building Inspector Sheehan's decision to rescind a violation which charged a dangerous roadway condition.  Mr. Maher was terminated as a result of same and there is direct evidence of retaliatory animus.  Councilman Javenes conceded that he went to Mr. Maher's house to discuss the Article 78 proceeding (DKT 23 Exh. U 44:4-12).  During the aforesaid discussion, Councilman Javenes stated "[the Article 78 proceeding] is not going to benefit you or the Town. Definitely not."  Councilman Javenes also stated "think about what's going to benefit you and the Town, because you are employed by the Town."  He also stated "you are not going to get anywhere by doing what you're doing.  It is only going to make things worse." (Exhibit C)

Building Inspector Sheehan, who has been in the aforesaid appointed position for over 31 years (DKT 23 Exh. N 5:10-15) refers to Town Supervisor Finn merely by "number 9" and "just another supervisor" (DKT 23 Exh. N 83:18-19) stated that when advised by Supervisor Finn that they were thinking of getting rid of Mr. Maher, and asked to interview his replacement, Building Inspector Sheehan said, "it's about time" (DKT 23 Exh. N 85:6-9).

Also, it was Building Inspector Sheehan who took part in interviewing Mr. Maher's replacement "just prior to" Mr. Maher's termination (DKT 23 Exh. N 61:23-25) and who recommended Lanc & Tully, the engineering firm that was hired because it was "a small firm" (DKT 23 Exh. N 68:10-14).  The small firm of Lanc & Tully was hired despite the fact that the Town's entire defense is premised on the purported economic benefit of hiring an outside engineering firm that "would be better equipped to work on the $600 million construction project of a waste-to-biofuels plant in the Town" (DKT 22 pg. 15 of the Town's Memorandum of Law).  Also, the small firm of Lanc & Tully was hired pursuant to Building Inspector Sheehan's recommendation, notwithstanding that Board Member Javenes testified that Mr. Maher was terminated because the Town needed the services of a "big firm" (DKT 23 Exh. U 60:2-3).

Notwithstanding that Supervisor Finn toes the party line, he sided with Building Inspector Sheehan against Mr. Maher and was quoted in an interview with a newspaper as follows: "The Town Board has officially chosen to back Sheehan and the Zoning Board on the matter … [Supervisor Finn] stated the town had faith in the decision-making process of the board and considered the suit an unwarranted 'waste of taxpayer money'" (Exhibit "I").

Also, notwithstanding that the Town's theme throughout its motion is that Mr. Maher was terminated and Lanc & Tully was hired in order to work on the New Planet Energy Project, a recent FOIL Request to the Town seeking the names and addresses of all consulting firms retained on behalf of the Town to review and comment on the New Planet Energy Project, elicited the following e-mail response from the Town on September 20, 2017: "as of this date no consulting firms have been retained Planning Board" (see Exhibits C and J)

**(ii)**     <u>The temporal relationship proximity is, at the very least, sufficient</u>

Notwithstanding that there is evidence of retaliatory animus, it is uncontested that the United States Court of Appeals "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too extenuated to establish a causal relationship between the exercise of a Federal constitutional right an allegedly retaliatory action." (See <u>Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County</u>, 252 F.3d 545 (2004).

Notwithstanding that there is no bright line to define the outer time limits, in this case, the Town gratuitously, self-servingly and artificially expands the timeframe to 10 months.

Yet, Mr. Maher was terminated on January 13, 2015 less than six days after Mr. Maher, by way of a letter (Exh. A), requested to appear back before the ZBA to have his appeal heard of Building Inspector Sheehan's decision to rescind the violation pertaining to a dangerous intersection. Also, the Town's lawyer Mr. Nugent (who was carbon copied on Exh. A) drafted the Resolution terminating Mr. Maher, using Mr. Nugent's firm as the only cost savings example). No analysis or discussion was done prior to voting on said Resolution as to whether or not Mr. Nugent's representation was true (See DKT 23 Exh. S, par. 69:5-21).

Also, Brian Nugent, Esq. of Ferrick, Lynch, MacCartney & Nugent, the outside counsel for the Town, filed a Notice of Appeal on December 5, 2014, which pursuant to CPLR 5519(a)(1), stayed all proceedings and Mr. Nugent enforced that stay prohibiting Mr. Maher from getting his appeal application back before the ZBA (See the Notice of Appeal which is annexed hereto as Exh. B and/or Nugent letter annexed hereto as Exh. H), clearly closing an alleged time gap. Notwithstanding the stay, Mr. Maher did try to put the matter back on by letter dated January 7, 2015 (Exh. A). Mr. Maher was terminated no more than

six days later on January 13, 2015. Contrary to the Town's position limiting the timeframe to the filing of the Article 78 proceeding, as set forth above, the matter was an ongoing process.

Additionally, in an effort to promote its theme that Mr. Maher was terminated for economic reasons, the Town in its Motion papers, ad nauseum, amplifies an additional theme of putting distance between the Town Supervisor(s) and the Councilman's knowledge of Mr. Maher's Article 78 proceeding and his termination. The Town purports that each of the aforesaid men could not recall when they learned of the Article 78 proceeding. For example, the Town in its local Rule 56.1 Statement purports that Councilman Javenes could not recall when he became aware of Mr. Maher's Article 78 Proceeding (DKT 24 Par. 104).

The Town also purports in its Local Rule 56.1 Statement that Councilman White did not know when he learned about Mr. Maher's Article 78 proceeding and that he could not recall when he became aware of the Court's decision regarding said procedure (DKT 24 Par. 132 and 137). Also, the Town purports that Mr. White did not know when he learned of Mr. Maher's proceeding before the ZBA (DKT 24 Par. 133).

In an effort to minimize the connection between the Article 78 proceeding and the termination of Mr. Maher, the Town, in its Local Rule 56.1 Statement purports that Supervisor Finn merely learned that Mr. Maher commenced an Article 78 proceeding "at some point" (DKT 24 Par. 48).

Also, Building Inspector Sheehan's testimony closes any purported gap between the whistleblowing and Mr. Maher's termination. Building Inspector Sheehan (who is at the center of the Article 78 proceeding), and who has been in the aforesaid appointed position for over 31 years (DKT 23 Exh. N 5:10-15), refers to Town Supervisor Finn merely by "number 9" and "just

another supervisor" (DKT 23 Exh. N 83:18-19).  When he was advised by Supervisor Finn that they were thinking of getting rid of Mr. Maher and asked him to interview Mr. Maher's replacement, Building Inspector Sheehan said, "it's about time" (DKT 23 Exh. N 85:6-9).  Also, it was Building Inspector Sheehan who took part in interviewing Mr. Maher's replacement "just prior to" Mr. Maher's termination (DKT 23 Exh. N 61:23-25) and who recommended Lanc & Tully, the engineering firm that was hired because it was "a small firm" (DKT 23 Exh. N 68:10-14).

Based on the foregoing, a jury could reasonably infer that the Town was biding its time to latch on to an event which could serve as a pretext (see <u>Benedict v. Town of Newburgh</u> et al., 125 F.Supp.2d 675 (U.S. Dist. Ct. SDNY 2000); see also <u>Hurdle v. Board of Ed. City of New York et al</u> (2002 WL 3183 4454).  The Court in <u>Benedict</u>, supra, also held, that notwithstanding that the Town argued that the Court should find as a matter of law that a six-month gap precluded causation, "while some Appellate Divisions have noted that the time elapsed between events is relevant, we know of no case in which the life expectancy of a political grudge has been established as a matter of law with such finite precision as [the Town] suggests."

Notwithstanding the aforementioned, the Town, through its Supervisor and Board should be prohibited from having it both ways; either it had notice of the Article 78 proceeding or it did not.  While the Town purports that Supervisor Finn did learn of Mr. Maher's Article 78 proceeding, the Town defines the time as follows: "at some point" (DKT Par. 48).  The Town's own words, at the very least, clearly raise a genuine issue of material fact to be tried.

**B.**    **The Town's contention that it terminated Mr. Maher and hired Lanc & Tully for economic reasons and for the $600 million waste-to-biofuels plant is pretext and a ruse.**

Notwithstanding that the Town's theme throughout its motion is that Mr. Maher was terminated and Lanc & Tully was hired in order to work on the New Planet Energy Project, a recent FOIL Request to the Town seeking the names and addresses of all consulting firms retained on behalf of the Town to review and comment on the New Planet Energy Project, elicited the following response from the Town on September 20, 2017: "as of this date no consulting firms have been retained" "Planning Board" (see Exhibits C and J).

Also, it was Building Inspector Sheehan who took part in interviewing Mr. Maher's replacement "just prior to" Mr. Maher's termination (DKT 23 Exh. N 61:23-25) and who recommended Lanc & Tully, the engineering firm that was hired because it was "a small firm" (DKT 23 Exh. N 68:10-14).

Yet, the small firm of Lanc & Tully was hired despite the fact that the Town's entire defense is premised on the purported economic benefit of hiring an outside engineering firm that "would be better equipped to work on the $600 million construction project of a waste-to-biofuels plant in the Town" (DKT 22 pg. 15 of the Town's Memorandum of Law). Also, the small firm of Lanc & Tully was hired pursuant to Building Inspector Sheehan's recommendation, notwithstanding that Board Member Javenes testified that Mr. Maher was terminated because the Town needed the services of a "big firm" (DKT 23 Exh. U 60:2-3).

Notwithstanding that the Town purports its basis for terminating Mr. Maher was the New Planet Energy Project, Supervisor Finn testified that "I don't have the dates…" when the new planet energy project was discussed and when asked how far back the discussion was he also said, "I don't know…" (See DKT 23 Exh. S 39:4-11). Supervisor Finn also testified that he did

not know the date that it was discussed to replace Mr. Maher and that the budget was passed including Mr. Maher's position prior to the decision to solicit outside engineering firms (See DKT 23 Exh. S pg. 45:17-25 pg. 46:1-11).

Councilman Basile testified that he did not recall if other than terminating the Town Engineer and hiring an outside firm, if there were other departments that the Board was talking about "advancing" (See DKT 23 Exh. T pg. 16:9-25-17:2-3).  Mr. Basile also testified that no other positions have been eliminated since Mr. Maher's position (See DKT 23 Exh. T pg. 38:19-22).

Councilman Basile testified that at the time the decision was made to terminate Mr. Maher's position and hire an outside firm no formal fiscal analysis was done to determine whether same generated a cost savings (See DKT 23 Exh. T pg. 19:14-18). Mr. Basile testified that [notwithstanding that Brian Nugent, Esq. of the "outside law firm" drafted the Resolution abolishing Mr. Maher's position using his firm as the only example of ("privatization") and cost savings (See DKT 23 Exh. F)], no assessment was done to determine whether or not the Resolution (See DKT 23 Exh. F) drafted by Mr. Nugent was accurate or cost saving (See DKT 23 Exh. T pg. 39-38-pg. 28:2-7).

Also, notwithstanding that the Resolution (See DKT 23 Exh. F) specifically stated that the Board considered the "volume of engineering work in the Town", Councilman Basile testified that he did not determine or inquire or had presented to him the daily or weekly function or special task functions that Mr. Maher did on a regular basis (See DKT 23 Exh. T pg. 16:3-8).  Councilman Basile testified that he was never presented with a financial analysis as to whether or not eliminating the Town Engineer position and hiring an outside firm actually saved money (See DKT 23 Exh. T pg. 31:2-20).

When asked how much the Town would save Councilman. Javenes testified "I'm not 100% sure" (See DKT 23 Exh. U pg. 10:13-15).  Also, notwithstanding that the Resolution (See DKT 23 Exh. F) stated that the Board, in terminating Mr. Maher, considered the "quality and quantity" of engineering services provided by a private engineering firm and the volume of engineering work in the Town, Councilman. Javenes testified that no written comparison was done comparing the scope of work between the outside engineering firm and Mr. Maher.  No one asked Mr. Maher what he did on an hour, weekly or daily basis (See DKT 23 Exh. U, pg. 20:20-25 and pg. 25:4-9).

Supervisor Monaghan testified that he did not know specifically what date or when it was discussed to eliminate the Town Engineer position (See DKT 23 Exh. W, pg. 42:23-25-43:2-6).  The audio of the alleged Town Board Meeting of October 28, 2014 does not include any statements referencing the elimination of the Town Engineer position (See DKT Exh. R) and the Town's attorney Randazzo concedes same in his e-mail (see Exh. D annexed hereto).  Also, Board Member James White, who sponsored the Resolution eliminating the Town Engineer position, and who made the motion sponsoring same (See DKT 23 Exh. X, pg. 21:11-17), testified that there was never a discussion at a public meeting to eliminate the Town Engineer position (See DKT 23, Exh. X, pg. 22:19-25-23:2-25).  There is no testimony as to when the Town received the proposals.

Supervisor Monaghan also testified that he never did an analysis comparing the duties performed by Mr. Maher and the duties performed by the outside engineering firm and did not know what duties each performed (See DKT 23 Exh. W pg. 65:20-25-pg 66:2-3 and pg. 67:2-9).  Supervisor Monaghan also testified that he did not do an analysis comparing the functions of the outside engineering firm with those of Mr. Maher (See DKT

23 Exh. W pg. 65:20-25 pg. 66:2-3).   Also, Building Inspector Sheehan, who gave his

opinion to the Town Board (it is undisputed that Monaghan was a Board Member at the

time) to hire Lanc & Tully did so because "it is a small firm" (see DKT 23 (Exh. N  68:3-

14).

Councilman White (who, as aforesaid, sponsored the Resolution terminating Mr. Maher)

testified that the Town Board Members' discussions related to "eliminate the position" was

talked about in "generic terms" and there was never a discussion about Mr. Maher's position

(See DKT 23 Exh. X pg. 22:9-25-pg. 23:2-15).   Also, Councilman White voted to hire Mr.

Maher in place of an outside engineering firm in order to save costs (See DKT 23 Exh. X pg.

6:4-11).

When Councilman White was asked if he or the Town Board analyzed the cost of

employing a Town Engineer compared to engaging an outside engineering firm prior to

eliminating the Town Engineer position, he answered "yes and no" (See DKT 23 Exh. X pg.

27:11-20).   Also, when Councilman White was asked if there was a financial analysis, he

testified "no" (See DKT 23 Exh. X pg. 28:6-13).

During Mr. Maher's tenure as the Town's Engineer, he attended numerous Planning

Board Meetings each year as part of his job duties and as the custom and practice of the Town.

Mr. Maher has reviewed the Town's Planning Board Minutes for 2015 and 2016 (Exhibit E) and

based on his experience and background as an engineer and the custom of the Town Engineer,

the aforesaid Minutes reflect that an engineer from Lanc & Tully attended and participated in at

least 14 meetings.   Generally, the Planning Board Meetings would last approximately 3.5 hours

and industry standards would permit Lanc & Tully to charge for its one-hour commute to said

meetings (Exhibit C).

Also, based on Mr. Maher's experience and background as an engineer and as the Town Engineer, it was the custom and practice for the Town Engineer to attend Technical Advisory Committee ("TAC") meetings ahead of each Planning Board Meeting in preparation for same. Generally, the TAC meetings would last approximately two hours; and it would be the custom and practice for Lanc and Tully to charge for its commute (Exhibit C).

Mr. Maher also reviewed the Town of Stony Point Account QuickReports for January through December 2015 and 2016 (DKT 23 Exhs. AA and BB, respectively) (the only documents relied upon by the Town for its purported cost-savings claim). Based on his experience and background as an engineer and as the Defendant Town's Engineer, Mr. Maher determined that the aforesaid Account QuickReports artificially lower the engineering services and costs thereof, as said Reports do not include Lanc & Tully's participation and services related to all of the Planning Board Meetings and preparation for same (Exhibit C).

Also, the Town has failed to include in its economic assessment of the engineering services or the engineering costs incurred by the Planning Board. Mr. Maher has reviewed the actual budgets for 2015 through 2017 and the proposed budget for 2018 (Exhibit G). As such, since his firing, the Planning Board expenses have doubled or tripled to approximately $70,000, $60,000 and $40,000.00 (budgeted amount for 2017) per year. Also, the Planning Board fees have more than doubled or tripled since his firing to approximately $130,000, $100,000 and $150,000 (budgeted amount for 2017) per year. Based on Mr. Maher's experience and background as an engineer and as the Town's Engineer, the aforesaid expenses and fees are a direct indicator of engineering costs, same of which have not been included in the Account QuickReports (DKT 23 Exhs. AA and BB) (again, the only documents relied upon by the Defendant for its purported costs-saving claim) (Exhibit C).

25

Also, the Town, by merely relying on the Account QuickReports (DKT 23 Exhs. AA and BB) are hiding, disguising and/or are artificially lowering the engineering services and costs thereof by failing to advise this Court that the Sewer Department has also incurred engineering expenses following Mr. Maher's termination (which it did not have prior thereto) in the amounts of approximately $17,000 and $15,000 per year for 2015 and 2016, respectively.   There is no current reporting of Sewer Department engineering costs for 2017.

The Town has also failed to reveal that the Highway Department incurred engineering costs of approximately $2,000 in 2016.   There are no reported Highway Department engineering costs for 2017, but there is an estimate of approximately $1,000 for 2018.   The aforesaid costs are reflected in the Town's Budget which is available on the Town's website and annexed hereto as Exhibit G (see also Exhibit C).

Also, notwithstanding that former Supervisor Geoffrey Finn testified that one of the reasons Mr. Maher was fired and Lanc & Tully was hired, was for a sewer project (DKT 23 Exh. S pig 38:13-18 and 39:22-25), Mr. Maher was told by Carl Kilpatrick, Assistant Treatment Plan Operator, that upgrades were not done on the Town's waste water treatment plan because Lanc & Tully did not have the experience.   Also, contrary to Mr. Finn's opinion, Mr. Maher advised Mr. Finn that he did have the experience for the aforesaid job (Exhibit C).

The Town's reliance on the New Planet Energy project, as the reason for Mr. Maher's termination, is a ruse and a pretext.   New Planet Energy is a proposed "waste-to-energy" plant. The site is the former INSULX paint production/warehouse site and is also a site where "agent orange" was produced.   The New Planet Energy project at best is in its infancy stage (Exhibit C). The New York State Department of Environmental Conservation was and still remains the lead

agency under SEQRA; hence, the Defendant has provided very little engineering services to date (Exhibit C).

The major theme throughout the Town's Motion for Summary Judgment and the alleged basis upon which Mr. Maher was terminated, is that Lanc & Tully was hired to work on the New Planet Energy project.  Yet, if the project ever comes to fruition, Lanc & Tully, as conceded by Building Inspector Sheehan, is a "small firm" (DKT 23 Exh. N pg. 6:13-16) and, according to Lanc & Tully's own pronouncement on their web page "a consulting firm specializing in civil engineering and surveying, including municipal engineering, land planning and development", they would not be qualified to review and comment on such a complex project.  Therefore, if the Town needs an opinion on the proposed plan's operations, they would need to hire other consultants to offer opinions.  Also, from their web page, Lanc & Tully does not have traffic engineering experience so traffic impacts caused by the project would need to be addressed by a separate traffic engineer (Exhibit C).

Mr. Maher was never asked by anyone from the Town prior to, or at the time the decision was made to terminate him as to the following: what he did on a daily, hourly or weekly basis; what special tasks he performed; or to compare the aforesaid to an outside engineering firm (Exhibit C).

Based on the foregoing, Monell liability does attach and the Mount Healthy does not apply.  The Town Board Resolution was clearly motivated by impermissible motivations.  As set forth above, Councilman Javenes, in sum and substance, told Mr. Maher that he would lose his job if he did not drop the Article 78 proceeding.  Supervisor Finn is on the record stating that he sided with Building Inspector Sheehan and that Mr. Maher's Article 78 proceeding was unwarranted.  Building Inspector Sheehan, who stated "it was about time" that Mr. Maher was

terminated and who interviewed Mr. Maher's replacement, was the one who recommended that Lanc & Tully be hired because it was a small firm.

The Town's claim is that Mr. Maher was terminated and replaced by Lanc & Tully for economic benefits and to work on the $600 million waste-to-biofuels plant. Based on all of the facts set forth above, said claim is a ruse and pretext. The facts, among many others set forth above, demonstrate the following: by way of an e-mail response to a FOIL request, the Town conceded that as of September 20, 2017, no consulting firms have been retained to work on the New Planet Energy Project; the small firm of Lanc & Tully was hired (DKT 23 Exh. N 68:10-14), rather than a "big firm" which was allegedly needed to replace Mr. Maher (DKT 23 Exh. U 60:2-3); notwithstanding that the Resolution terminating Mr. Maher was allegedly based on the consideration of the volume, quality and quantity of engineering services needed by the Town, none of the Board Members or the Supervisor voting for said Resolution inquired of Mr. Maher as to what he did on an hourly, weekly or daily basis (DKT 23 Exh. T 16:3-8, 31:2-20, Exh. U 20:20-25 and 25:4-9, Exh. W 65:20-25, 66:2-3, 67:2-9, Exh. X 28:6-13); the Town merely relying on Account QuickReports (DKT Exh. AA and BB) have artificially lowered, hid and disguised the actual engineering costs incurred each year; and no analysis was done before, during or after Mr. Maher's termination to determine whether same generated a cost savings (DKT 23 Exh. T 19:14-18, Exh. U 10:13-15, Exh. W 65:20-25 and 66:2-3 and 67:2-9, Exh. X 28:6-13).

The Town has neither presented clear evidence that the Board voted to terminate Mr. Maher for legitimate reasons or that the decision was well-reasoned or deliberate. At the very least, genuine issues of material fact exist regarding same. Also, prior to the Resolution to terminate Mr. Maher, the Town had not considered same at any time during his six-year tenure.

In fact, the opposite is true; Councilman White voted to hire Mr. Maher to replace an outside engineering firm (DKT 23 Exh. X 64:4-11).

### III.  Mr. Maher's New York State Law whistleblower claim should not be dismissed

First, the Arguments set forth above in II. are incorporated herein.

When Mr. Maher was asked what specific rule or regulation or procedure that he could cite that the Building Inspector violated by rescinding and withdrawing the notice, he stated as follows: "I would have to – I don't have the code memorized so I would have to look through it and actually give it to you." (DKT 23 Exh. H 121:5-12).

The Town has grossly misled, misquoted and took out of context Mr. Maher's testimony as well as what is set forth in his Complaint (DKT 23 Exh. A) by merely citing to a very small portion of the Complaint and purporting that Mr. Maher only alleged a violation of the "Coon Series".  The Town disingenuously failed to include all of the other allegations in Mr. Maher's Complaint which include the following:

Pursuant to NY Civil Service Law § 75-b, Mr. Maher, in his Complaint (DKT 23 Exh. A) properly and inclusively alleged that Building Inspector Sheehan's violated the Defendant's policy, rules, regulations and procedures including the New York State Zoning Enforcement Procedures including the [Coon series]".  Additionally, Mr. Maher alleged in his Complaint that "Building Inspector [Sheehan] withdrew and/or rescinded a violation involving issues relating to an alleged dangerous roadway intersection located in the Town of Stony Point…The Town Building Inspector, wrongfully rescinded and/or withdrew a violation by a property owner(s) in the Town of Stony Point relating to Chapter 215, Article IV, Section 23 C of the Defendant Town Code…The aforesaid Building Inspector violated the aforesaid Defendant's rules by failing to pursue violations of the law and/or Defendant

29

Town Code without undue bias for or against a particular person(s); which creates and presents a substantial and specific danger to the Public health or safety, including a dangerous roadway condition…" (DKT 23 Exh. A).

Notwithstanding that Mr. Maher alleged, among other things, violation of Defendant Town Code Chapter 215 Article IV, Section 23C, the James A. Coon series published by the New York State Department of State and has recently been relied upon by a New York Court as authoritative (see People v. Rafalowitz, 43 Misc.3d 1232(A) (Dist. Ct. Nassau Cty NY 2014).

Also, notwithstanding that it is the Town's position (in order to distance itself from the whistleblowing) that Supervisor Monaghan (who was not only a Town Board Member, Town Supervisor, a retired New York City Police Lieutenant and a retired bus driver for the Haverstraw Transit Bus Company) (See DKT 23 Exh. W pg. 6:2-7), didn't take a big interest in [the Article 78 proceeding] and that it "wasn't a big deal" (DKT 24 page 129), Supervisor Monaghan, nonetheless, testified that he had a bus route along the dangerous intersection at issue and that is was an unsafe condition with overhanging bushes and he agreed that they should be cut (See DKT 23 Exh. W pg. 19:13-25-pg 20:2-19); yet, Building Inspector Sheehan rescinded the charges against the property owner of the aforesaid bushes in violation of Defendant's Town Code relating to Chapter 215, Article IV, Section 23C [as alleged in Mr. Maher's Complaint (DKT 23 Exh. A)].  As such, Town Supervisor Monaghan, has conceded that Building Inspector Sheehan's actions were improper within the meaning of Section 75-b.

At the very least, based on the foregoing, including all of the allegations set forth in the Complaint, genuine issues of material facts exist to be tried and the Town's Motion for Summary Judgment should be denied in its entirety.

## CONCLUSION

For the reasons set forth above, the Court should deny the relief requested by the Town in its entirety.

Dated: October 24, 2017

KEVIN T. CONWAY, ESQ.
Attorney for Plaintiff

/s/ Kevin T. Conway, Esq.
Kevin T. Conway, Esq. (KTC-3347)
664 Chestnut Ridge Road
Spring Valley, New York 10977
kconway@ktclaw.com

To:     Counsel of Record
         Via ECF

31