UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KEVIN P. MAHER,

                              Plaintiff,

          v.

TOWN OF STONY POINT,

                              Defendant.

No. 16-CV-607 (KMK)

OPINION & ORDER

Appearances:

Kevin T. Conway, Esq.
West Nyack, NY
*Counsel for Plaintiff*

James A. Randazzo, Esq.
Drew W. Sumner, Esq.
Portale Randazzo LLP
White Plains, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

　　Plaintiff Kevin P. Maher ("Plaintiff"), formerly the Town Engineer in the Town of Stony

Point, brings this Action against the Town of Stony Point (the "Town" or "Defendant"), pursuant

to 42 U.S.C. § 1983, alleging that Defendant violated Plaintiff's rights under the First

Amendment when the Town Board—comprised of non-parties Tom Basile ("Basile"), Karl

Javenes ("Javenes"), James White ("White"), Jim Monaghan ("Monaghan"), and Geoffrey Finn

("Finn")—unanimously voted to eliminate the Town Engineer position in retaliation for his

institution of an Article 78 proceeding against the Town. (*See* generally Compl. (Dkt. No. 1).)

Plaintiff also brings a retaliation and whistleblowing claim under New York Civil Service Law

§ 75-b based on the alleged actions taken against him after he complained of coworker

misconduct. (*See id.*) Defendant has moved for summary judgment on all of Plaintiff's causes

of action.  (*See* Not. Of Mot. for Summ. J. (Dkt No. 21).)  For the reasons to follow, Defendant's Motion is denied.

## I.  Background

### A.  Factual History

In resolving Defendant's Motion for Summary Judgment, the Court will recite only either undisputed facts or those set forth by Plaintiff and supported by the record.  The Court will not, except as noted, set forth Defendant's version of the facts where disputed.

Plaintiff served as the Town Engineer in the Town of Stony Brook from January 5, 2009 until his position was eliminated on January 13, 2015.  (Def.'s Local Rule 56.1 Statement ("Def.'s 56.1") ¶ 1 (Dkt. No. 24); Pl.'s Resp. and Objs. to Def.'s 56.1 Statement ("Pl.'s 56.1 Resp.") ¶ 1 (Dkt. No. 30).)  While Plaintiff was employed as Town Engineer, he received a salary and benefits.  (Def.'s 56.1 ¶ 27; Pl.'s 56.1 Resp. ¶ 27.)  Specifically, Plaintiff earned a salary of $87,172.02 in 2012, (Def.'s 56.1 ¶ 30; Pl.'s 56.1 Resp. ¶ 30), $88,812.24 in 2013, (Def.'s 56.1 ¶ 29; Pl.'s 56.1 Resp. ¶ 29), and $90,687.92 in 2014, (Def.'s 56.1 ¶ 28; Pl.'s 56.1 Resp. ¶ 28).  The Town also paid $20,570.20 for Plaintiff's healthcare insurance in 2014, although it does not provide the amounts paid for any other year.  (Def.'s 56.1 ¶ 32.)[1]  Plaintiff's total compensation in 2014, the last full year he was employed by the Town, was $111,258.12.  (*Id.* ¶ 33.)

---

[1] Plaintiff's 56.1 Response disputes this statement, but cites no record evidence to the contrary.  Defendant cites to Monaghan's sworn affidavit, (Randazzo Decl. Ex. B ("Monaghan Aff.") ¶ 15), which confirms that the Town paid the aforementioned amount in 2014, as well as payments toward his pension, short term disability, and workers' compensation insurance, (*id.*).  Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).  *See* S.D.N.Y. Civ. R. 56.1(d).  Therefore, where Plaintiff has offered no citation to admissible evidence in the record, the Court will consider this fact undisputed.

<u>1.  Initial Zoning Board Appeal</u>

Plaintiff's claim initially stems from an application filed by Plaintiff with the Town

Zoning Board of Appeals ("ZBA") on October 30, 2013, wherein Plaintiff appealed Town

Building Inspector William Sheehan's ("Sheehan") decision to rescind a violation notice issued

to Erich and Kimberly Vonheim related to the "[e]xcessive growth of vegetation . . . [b]asically,

trees that were obstructing the line of sight [at an intersection] . . . on the Vonheim property."

(Decl. of James A. Randazzo, Esq. ("Randazzo Decl.") Ex. E ("Pl.'s 50-h Hearing") 26 (Dkt. No.

23); *see also* Randazzo Decl. Ex. J ("Pl.'s ZBA Appeal").)  The Vonheim property was "right

across the street" from Plaintiff's home, (Pl.'s 50-h Hearing 27), and Plaintiff had previously

complained to Sheehan in "late 2012 or early 2013" regarding the overgrown trees that were

"obstructing a view at the intersection," (*id.* at 29).  A violation was issued to Erich and Kimberly

Vonheim on May 30, 2013 pursuant to Town Code § 215–23.  (Randazzo Decl. Ex. L ("Notice of

Violation").)  However, after conducting an inspection of the property on October 17, 2013,

Sheehan determined that the trees had been trimmed, and thus rescinded the violation.

(Randazzo Decl. Ex. M ("Rescind Letter"); Randazzo Decl. Ex. H ("Pl.'s Dep.") 81–82.)

Plaintiff "could see that some branches were trimmed," but still believed that the trees "were

obstructing the intersection."  (Pl.'s 50-h Hearing 32.)  Accordingly, Plaintiff appealed to the

ZBA, as he "believed that . . . Sheehan erred in granting [the Vonheims] that rescind letter and

rescind notice [because] the danger was still there."  (Pl.'s Dep. 82; *see also* Pl.'s ZBA Appeal 3

("The property owner has not trimmed the vegetation sufficiently to remove visual obstruction at

the intersection.").)  Plaintiff's appeal was heard by the ZBA, and, on February 6, 2014, the ZBA

dismissed his claim for lack of standing.  (*See* Randazzo Decl. Ex. O ("ZBA Decision") 3–6.)

The ZBA determined that because Plaintiff was the Town Engineer, he had no ability to

independently enforce the Town Code and separately had no actual injury stemming from the alleged violation. (*Id.*)

Plaintiff thereafter filed an Article 78 proceeding in Rockland County Supreme Court on March 7, 2014 to challenge the ZBA's decision. (Def.'s 56.1 ¶ 23; Pl.'s 56.1 Resp. ¶ 23.) After Plaintiff filed his suit, Finn was quoted in the Rockland County Times as stating that Plaintiff's suit was a "waste of taxpayer money." (Decl. of Kevin T. Conway, Esq. ("Conway Decl.") Ex. I ("Rockland County Times Article") (Dkt. No. 29).) The Town Board, including Finn, unanimously voted to authorize legal representation to defend the Town in the Article 78 proceeding. (*See* Conway Decl. Ex. F. ("Article 78 Resolution").) Additionally, an unspecified time after the Article 78 proceeding was filed, Javenes went to Plaintiff's home to discuss the pending Article 78 proceeding and "see what the issue was and see if [Plaintiff] could resolve it amicably." (Randazzo Decl. Ex. U ("Javenes Dep.") 44.) According to Plaintiff, Javenes said "he was concerned about the Article 78 [proceeding]. He didn't see how it was going to benefit the Town or benefit [Plaintiff]." (Pl.'s Dep. 112.) Plaintiff contends that Javenes, "threatened [Plaintiff's] job if [he] did not drop the case," and that Plaintiff's suit was "only going to make things worse." (Conway Decl. Ex. C ("Pl.'s Aff.") ¶ 18 (internal quotation marks omitted).)[2]

---

[2] Defendant contends that Plaintiff attempts to create a fact dispute by contradicting his own deposition testimony in his Affidavit by adding additional detail to his conversation with Javenes regarding the Article 78 proceeding. (*See* Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply") 3–4 (Dkt. No. 31).) While Defendant is correct that Plaintiff may not create a fact dispute by contradicting his own deposition testimony, *see Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991), that is not what occurred here. Plaintiff testified that Javenes "was trying to find [out] if there was a way that [Plaintiff] could drop the [Article] 78," as he "was concerned about the Article 78. He didn't see how it was going to benefit the Town or benefit [Plaintiff]." (Pl.'s Dep. 112.) This is consistent with his Affidavit. Plaintiff did not affirmatively state in his deposition that Javenes said anything else with regard to the Article 78 proceeding, but rather that he could not recall "off the top of [his] head right now." (*Id.* at 113.) The Affidavit, which simply adds more detail to the conversation he had with Javenes, does not contradict Plaintiff's prior testimony, but rather clarifies and

The Rockland County Supreme Court reversed the ZBA's decision on October 30, 2014, holding that Plaintiff did have standing to pursue his appeal before the ZBA and remanded the case to the ZBA for further consideration. (Def.'s 56.1 ¶ 24; Pl.'s 56.1 Resp. ¶ 24.) The Town thereafter filed a notice of appeal on December 5, 2014, thereby staying the ZBA's further adjudication of the dispute. (Pl.'s 56.1 Resp. ¶ 25; Conway Decl. Ex. B ("Notice of Appeal").) Nonetheless, Plaintiff, through counsel, wrote to the ZBA on January 7, 2015, seeking to schedule Plaintiff's hearing "for the next available meeting." (Conway Decl. Ex. A ("Conway Jan. 7, 2015 Letter").) The Town informed Plaintiff that the matter was stayed pending the Town's appeal. (Conway Decl. Ex. H ("Nugent Jan. 14, 2015 Letter").)

### 2. Initial Discussions Regarding "Cost Saving" Measures

At the Town Board meeting on October 28, 2014—roughly one year after Plaintiff filed his appeal to the ZBA, seven months after Plaintiff commenced his Article 78 proceeding, and two days before the Rockland County Supreme Court reversed the ZBA's decision—the Town Board discussed certain ways that the Town could cut costs. (*See* Randazzo Decl. Ex. R ("Oct. 28, 2014 Board Meeting Recording") 2:18:10.) The Town Board never specifically discussed eliminating the Town Engineer position; instead, the focus was on potential cost saving measures more generally, including outsourcing various Town functions to private entities. (*See id.*) This conversation was repeated at a public Town Board meeting on November 12, 2014, where the

---

further explains it. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("[A] material issue of fact may be revealed by . . . subsequent sworn testimony that amplifies or explains, but does not merely contradict, . . . prior testimony.") (citations omitted). At summary judgment, "the [C]ourt . . . should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998), *amended by* 169 F.3d 782 (2d Cir. 1998). Accordingly, the Court will consider Plaintiff's affidavit with regard to the conversation between Plaintiff and Javenes.

Town Board further considered budgetary savings from benefit cuts that would flow from outsourcing town functions and town employees to outside firms. (*See* Randazzo Decl. Ex. V ("Nov. 12, 2014 Board Meeting Recording") 1:26:30, 1:30:45–1:32:00.) No mention is made at either meeting with regard to eliminating any specific position.

Although Finn disputes this, (Randazzo Decl. Ex. S ("Finn Dep.") 56–57), it appears that he first raised the prospect of hiring an engineering consulting firm, and "was spearheading the effort or presenting the effort to have the position eliminated and hire the outside firm," (Javenes Dep. 22–23)). Javenes testified that no Town Board members were against the move, nor did any of the Town Board members "express any concern that . . . the Town was making a mistake," in eliminating Plaintiff's position. (*Id.* at 23.) Finn, as the Town Supervisor, was responsible for soliciting bids from outside firms. (Finn Dep. 56–57.) Finn could not recall the exact date that the decision was made to start soliciting engineering firms to replace Plaintiff, (*id.* at 45), but believed it was "probably a month or two before" the January 13, 2015 meeting, (*id.*). Indeed, Lanc & Tully Engineering and Surveying P.C. ("Lanc & Tully") wrote a letter to Finn on December 3, 2014, "per [Finn's] request," which purported to be a "submission to be considered for the Town's Engineering Consultants," as it was their "understanding that [the Town was] contemplating hiring an engineering consulting firm to assist the Town in its engineering needs." (Randazzo Decl. Ex. CC ("Lanc & Tully Dec. 3, 2014 Letter") 1.)

Finn and the rest of the Town Board believed that the cost of engaging an outside firm would ultimately be less than employing a Town Engineer. (Finn Dep. 56–57.) Indeed, Finn and Javenes both testified that the analysis was as simple as taking the "number that [Plaintiff] cost [the Town] as employee and benefits, and . . . the number that was given to [the Town] by [a] company, and [the outside firm's number] was lower." (*Id.* at 49; *see also* Javenes Dep. 19 ("Q.

I'm asking, how did you come to that determination that it was a great savings? A. We figured on how much it was for [Plaintiff] and then we figured on how much it would be for the engineer on a typical year and that's how we came up with savings.").) However, the cost analysis did not include a comparison of whether the outside firm's costs, functions, and services would "match[] up" with the "functions and services that [Plaintiff] provided." (Finn Dep. 51; *see also* Javenes Dep. 20 ("Q. Did anyone perform a written comparison or a County comparison to determine whether the bids were equivalent in rate or scope or time versus what it was costing the Town per year for [Plaintiff]? A. There was nothing in writing.").) Rather, the Town Board's analysis was limited solely to the bottom line figure. (Finn Dep. 50 ("Q. And so it's your testimony that [the outside firms] gave you a bottom number, and you looked at what you believed it was costing you through the current employee providing engineering services? A. Yes.").) Nonetheless, Javenes believed that the Town could save "somewhere around $100,000" annually. (Javenes Dep. 20.) All of the Town Board members shared the view that replacing Plaintiff with an outside firm would ultimately result in cost savings for the Town. (*See* Def.'s 56.1 ¶¶ 63, 81, 121, 141.) Furthermore, Monaghan testified that he was also motivated by discussions between the Town Board and NPE Holdings LLC regarding construction of a waste-to-biofuels facility, as he believed an outside firm was better suited to handle such a project. (*See* Def.'s 56.1 ¶ 122.)

Throughout this time, the Town Board never held a public meeting to discuss eliminating the Town Engineer position. (*See* Randazzo Decl. Ex. X ("White Dep.") 23 ("Q. . . . there was never a discussion either about [Plaintiff] or his position during these discussions? MR. RANDAZZO: In the public meeting? MR. CONWAY: Yes. A. No.").) Nor did the Board ever discuss this matter with Plaintiff or advise him that the Town was considering eliminating his position. (*See e.g.*, *id.*at 24; Finn Dep. 57–59.) While Finn testified that there was "not really" a

reason that Plaintiff was not advised of this decision, (Finn Dep. 58), he conceded that the Town "didn't need any bad press for that [decision]," and that the Town Board "wanted the trust out first," and "wanted the actual resolution to be printed, not something made up by a newspaper reporter," (*id.* at 58–59).

### 3.  Plaintiff's Termination

Plaintiff was first informed by Town Supervisor Finn that the Town Board was eliminating his position, thus terminating Plaintiff's employment with the Town, at roughly 4:30 PM on January 13, 2015.  (Pl.'s Dep. 43–44.)  This was six days after Plaintiff had reached out to the ZBA about his pending appeal.  (Conway Jan. 7, 2015 Letter.)  Finn informed Plaintiff that the Town Engineer position was being terminated because "the [T]own believe[d] [it] could save money by using an outside consulting firm that may or may not have services that can be provided on an as needed basis that [Plaintiff] [could not] provide."  (Pl.'s Dep. 44.)  Plaintiff understood that the Town was "making . . . a business decision," as Finn "tried to describe in greater detail why he believed that [the Town was] going to have the cost savings."  (*Id.* at 45.)  At no time during this meeting was any reason other than the perceived cost savings offered as a justification for Plaintiff's termination.  (*See id.* ("Q.  Were all the reasons based upon cost savings or were there other issues?  A.  Cost savings.  That's what he was alleging in his statements.  Q.  Is that the only reason that he gave you, cost savings?  A.  Yes, he said there were no other reasons.").)  Plaintiff testified that he had "a good working relationship" with Finn, and that he "believed him" when Finn told Plaintiff that the decision was not personal, but was solely about cost savings.  (Pl.'s 50-h Hearing 24.)

A few hours later, at 7:00 PM, the Town Board voted unanimously to eliminate the Town Engineer position, (Randazzo Decl. Ex. F ("Town Engineer Resolution")), and to thereafter

authorize Finn to enter into an agreement with Lanc & Tully wherein the firm would provide engineering consulting services to the Town, (*id.* Ex. G ("Lanc & Tully Resolution")). Ultimately, no other position was eliminated alongside the Town Engineer position, nor has the Town eliminated any position since January 2015 as a cost savings measure. (*See* Randazzo Decl. Ex. T ("Basile Dep.") 38.)

The Parties dispute whether the Town actually realized any cost savings from eliminating the Town Engineer position. Defendant contends that the Town spent $39,087.74 on Town Engineer expenses in 2015, (Randazzo Decl. Ex. B ("Monaghan Aff.")) ¶ 19), and $23,053.70 on Town Engineer expenses in 2016, (*id.* ¶ 21). According to Monaghan, even when including increased expenses that resulted from unanticipated engineering expenditures related to the Town Sewer Department, "[t]he total cost to the Town for engineering services in 2015 was less than $60,000. In 2016, engineering services cost the Town less than $41,000." (Decl. of James A. Randazzo, Esq. in Further Support of Mot. for Summ. J. ("Randazzo Reply Decl.") Ex. FF ("Monaghan Reply Aff.") ¶ 13 (Dkt. No. 32).) Plaintiff, however, contends in his Affidavit that the Town's reports regarding engineering expenditures "artificially lower[] the engineering services and costs thereof as said [r]eports do not include Lanc & Tully's services related to all of the Planning Board Meetings and preparation for same." (Pl.'s Aff. ¶ 7.) Indeed, Plaintiff notes that the budgets for the Planning Board show that "expenses have doubled or tripled," and "fees have more than doubled or tripled," since Plaintiff was terminated in January 2015. (*Id.* ¶ 8.) According to Plaintiff, these increased expenses and fees "are a direct indicator of engineering costs." (*Id.*) Defendant disputes Plaintiff's characterization of those expenses. (Monaghan Reply Aff. ¶ 7.)

B.  Procedural History

Plaintiff initiated this Action by filing a Complaint in Rockland County Supreme Court on January 7, 2016.  (Compl. (Dkt. No. 1).)  Defendant removed the case to this Court on January 27, 2016.  (Notice of Removal (Dkt. No. 1).)  After a failed attempt at mediation, (Dkt. No. 5), the Court then held an initial conference on October 20, 2016, after which the Court set a discovery schedule, (Dkt. No. 7).  After the close of discovery, Defendant filed a pre-motion letter on June 13, 2017 seeking to file the instant Motion.  (Letter from James A. Randazzo, Esq. to Court (Dkt. No. 15).)  Plaintiff filed a request for an extension of time to respond on June 20, 2017, (Letter from Kevin T. Conway, Esq. to Court (June 20, 2017) ("Conway June 20 Letter") (Dkt. No. 16)), which the Court granted that same day, (Order (Dkt. No. 17)).  Plaintiff failed to file a pre-motion letter prior to the Court's pre-motion conference on June 21, 2017.  (*See generally* Dkt.)  After the pre-motion conference, the Court set a briefing schedule.  (Mot. Scheduling Order (Dkt. No. 18).)   On September 1, 2017, Defendant filed its Motion and accompanying papers.  (*See* Dkt. Nos. 21–24.)  On October 12, 2017, Plaintiff filed a request for an extension of time to file his Opposition, (*see* Letter from Kevin T. Conway, Esq. to Court (Oct. 12, 2017) ("Conway Oct. 12 Letter") (Dkt. No. 25)), and then filed another letter on October 16, 2017 requesting the same scheduling adjustment, as he realized that his Opposition was actually due on October 6, 2017, (Letter from Kevin T. Conway, Esq. to Court (Oct. 16, 2017) ("Conway Oct. 16 Letter") (Dkt. No. 26)).  The Court granted Plaintiff's request, and set a new briefing schedule for the Opposition and Reply.  (*See* Order (Dkt. No. 27).)  Plaintiff thereafter filed his Opposition and accompanying papers on October 24, 2017, (*see* Dkt. Nos. 28–30), and Defendant filed its Reply and accompanying papers on November 8, 2017, (*see* Dkt. Nos. 31–33).

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of N.Y.*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. M21–88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B.  Analysis

1.  Retaliation

a.  Prima Facie Case

Plaintiff claims that the Town retaliated against him for engaging in protected speech under the First Amendment.  "To survive summary judgment on a First Amendment retaliation claim, a public employee must establish a prima facie case by bringing forth evidence showing that [1] he has engaged in protected First Amendment activity, [2] he suffered an adverse employment action, and [3] there was a causal connection between the protected activity and the adverse employment action."  *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (alterations and internal quotation marks omitted); *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011) (same).   If a plaintiff makes out such a prima facie retaliation claim, summary judgment for the defendant is not appropriate unless it can establish as a matter of law either of two defenses: (1) the defendant "would have taken the same adverse employment action even in the absence of the protected [speech]," *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251–52 (2d Cir. 2006) (internal quotation marks omitted); or (2) "the plaintiff's expression was likely to disrupt the government's activities and . . . the harm caused by the disruption outweighs the value of the plaintiff's expression," *Anemone*, 629 F.3d at 115 (internal quotation marks omitted).

The Town does not dispute that Plaintiff has satisfied the first two requirements of the retaliation analysis, (*see* Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 12–14 (Dkt. No. 22)); thus, the sole issue before the Court as to Plaintiff's prima facie case is whether there was a causal connection between the protected speech and the adverse employment action.

"To establish causation, a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Nagle v. Marron*, 663 F.3d 100, 109 (2d Cir. 2011) (internal quotation marks omitted). "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith*, 776 F.3d at 118; *see also Jackson v. City of New York*, No. 14-CV-5755, 2015 WL 5698535, at *5 (S.D.N.Y. Sept. 28, 2015) (same). "[A] direct showing requires plaintiff to provide tangible proof of retaliatory animus, [and] conclusory assertions of retaliatory motive are insufficient," *Smith*, 776 F.3d at 118–19 (internal quotation marks omitted), while an indirect showing may be done via, inter alia, temporal proximity, *see Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 511 (E.D.N.Y. 2011). Although the Second Circuit "ha[s] not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between a protected activity and an allegedly retaliatory action, courts . . . have typically measured that gap as a matter of months, not years." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 131 (2d Cir. 2012) (internal quotation marks omitted). "Thus courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Frisenda*, 775 F. Supp. 2d at 512 (collecting cases); *see also Maco v. Baldwin Union Free Sch. Dist.*, 249 F. Supp. 3d 674, 679 (E.D.N.Y. 2017) (same), *aff'd*, 726 F. App'x 37 (2d Cir. 2018); *Flood v. UBS Global Asset Mgmt.*, No. 10–CV–374, 2012 WL 288041, at *17 (S.D.N.Y. Feb. 1, 2012) (same); *but see Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("[F]ive months is not too long to find the causal relationship."); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 554 n.5 (2d Cir. 2001) (same, collecting cases where a causal connection was

found where the adverse action was taken anywhere between six weeks and eleven months from the protected conduct).

However, there are exceptions to this two-month guidepost. For example, courts in the Second Circuit have found that "[a] seven or eight month gap between a plaintiff's protected activity and the adverse action can support an inference of causation where other circumstances bolster the otherwise attenuated connection between the protected activity and the retaliatory action." *Quarless v. Brooklyn Botanic Garden Corp.*, No. 11-CV-5684, 2014 WL 2767085, at *6 (E.D.N.Y. June 18, 2014) (citing *Summa v. Hofstra Univ.*, 708 F.3d 115, 128–29 (2d Cir. 2013)), *aff'd*, 611 F. App'x 28 (2d Cir. 2015); *see also Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446–47 (2d Cir. 1999) (holding abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit approximately one year earlier), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980) (holding more than eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship).

Here, the timeline of events is somewhat complicated, but it is not in dispute. Plaintiff first filed his complaint with the Town Zoning Board of Appeals ("ZBA") on October 30, 2013. (Pl.'s ZBA Appeal.) Then, on February 6, 2014, the ZBA dismissed Plaintiff's appeal for lack of standing. (*See* ZBA Decision 3–6.) On March 7, 2014, Plaintiff filed an Article 78 proceeding in Rockland County Supreme Court to challenge the ZBA's decision. (Def.'s 56.1 ¶ 23; Pl.'s 56.1 Resp. ¶ 23.) The ZBA's decision was reversed by the Rockland County Supreme Court on October 30, 2014, (Def.'s 56.1 ¶ 24; Pl.'s 56.1 Resp. ¶ 24), and the Town filed a notice of appeal on December 5, 2014, (Notice of Appeal). Approximately one month later, on January 7, 2015, Plaintiff, through counsel, wrote to the ZBA, seeking to schedule Plaintiff's hearing "for the next

available meeting." (Conway Jan. 7, 2015 Letter.) Six days later, Plaintiff's position was officially eliminated by unanimous vote of the Town Board. (Town Engineer Resolution.)

After "carefully consider[ing] the time lapse in light of the entire record," *Frisenda*, 775 F. Supp. 2d at 512, and drawing all reasonable inferences in Plaintiff's favor, the Court concludes that the evidence of temporal proximity is sufficient to support an inference of retaliation. While this saga began approximately one year and two months before Plaintiff's position was abolished, the process of litigating this dispute was not so simple. Plaintiff initiated his Article 78 proceeding, appealing the Town's decision, 10 months before his termination and seven months before the Town contends it first discussed the prospect of eliminating any positions in favor of outsourcing on October 28, 2014. (*See* Def.'s 56.1 ¶ 34; Oct. 28, 2014 Board Meeting Recording 2:18:10.) Then, less than two weeks after Plaintiff prevailed in his Article 78 proceeding, the Town again discussed the prospect of eliminating various positions in even greater detail. (Nov. 12, 2014 Board Meeting Recording 1:26:30, 1:30:45–1:32:00.) Moreover, submissions from engineering firms were not solicited until "probably a month or two before" the January 13, 2015 meeting, (Finn Dep. 45), and Lanc & Tully's submission was sent on December 3, 2014, (Lanc & Tully Dec. 3, 2014 Letter). This submission was sent a mere month after Plaintiff prevailed in Rockland County Court, and only eight months after the proceeding was first initiated. In fact, Plaintiff's Article 78 proceeding against the Town was still ongoing at the time the Town was allegedly mulling over Plaintiff's termination, as evidenced by the Notice of Appeal and the Town's letter indicating the stay of proceedings in light of the appeal. (Notice of Appeal; Nugent Jan. 14, 2015 Letter.) The Second Circuit has previously found that commencing the process of firing an employee approximately seven to eight months after the initiation of an ongoing litigation is sufficient for purposes of establishing temporal proximity.

*See Summa,* 708 F.3d at 128 ("The seven-month gap between [the plaintiff's] filing of the instant lawsuit and the decision to terminate her employment privileges is not prohibitively remote."); *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (finding that "the passage of only six months between the dismissal of [the plaintiff's] lawsuit and an allegedly retaliatory beating by officers, one of whom . . . was a defendant in the prior lawsuit, [wa]s sufficient to support an inference of a causal connection"); *Grant,* 622 F.2d at 45–46 (holding eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship).

Additionally, Plaintiff was terminated six days after he attempted to restart the litigation process with regard to his initial complaint. (*See* Conway Jan. 7, 2015 Letter; Town Engineer Resolution.) Defendant argues that the January 7, 2015 letter is irrelevant, as it "ignores the months of consideration and decision-making by the Town Board that preceded [the] letter, namely, internal planning to cut costs by eliminating the Town Engineer position and then accepting bids and interviewing prospective firms." (Def.'s Reply 6.) Yet these "months of consideration," (*id.*), may also allow for a reasonable jury to infer a retaliatory motive, as they indicate that the Town needed to effectively "build a case" against Plaintiff to have a replacement at the ready in advance of officially terminating his employment, *see Frisenda*, 775 F. Supp. 2d at 513 (noting that "testimony . . . that termination is not immediately available . . . as an option; rather, the Village must 'build a case' against the [employee] in order to terminate [his or her] employment," creates a reasonable inference of retaliation and explanation for a time lapse between the protected speech and adverse action).

Critically, there is simply no evidence in the record as to when the actual decision to eliminate Plaintiff's position was made. (*See* Monaghan Aff. ¶¶ 3–13 (noting that discussions began on October 28, 2014 and that the Town Engineer position was abolished on January 13,

2015, but not identifying the date a final decision was made); Finn Dep. 55–57 (same); Basile

Dep. 21–22 (same); White Dep. 21–26 (same).)  In fact, Finn testified that as of November 2014,

when the 2015 budget was passed, Plaintiff's position as Town Engineer was "an approved line

item in the budget."  (Finn Dep. 46.)  Approximately two months after Plaintiff's position was

approved in the budget, it was eliminated—a mere six days after he wrote to the ZBA.  Given the

lack of any definitive, or even approximate, date in the record as to when the final decision was

made to eliminate Plaintiff's position, it would be reasonable for a fact-finder to infer that

Plaintiff's attempt to revive his appeal to the ZBA on January 7, 2015—less than one week

before the resolution was passed—led to the final decision of the Town Board to replace Plaintiff

with Lanc & Tully.  This would undeniably fall within the realm of temporal proximity approved

by the Second Circuit.  *See, e.g.*, *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir.

2013) (holding a "three-week period from [the plaintiff's] complaint to her termination is

sufficiently short to make a prima facie showing of causation indirectly through temporal

proximity").  Accordingly, in considering the timeline of events in light of the entire record, and

drawing all reasonable inferences in favor of Plaintiff, the temporal proximity between Plaintiff's

protected activity and his adverse employment action supports a claim of retaliation.  *See Cioffi*

*v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 168 (2d Cir. 2006) ("[T]he lapse of

only several months after the letter and several weeks after the press conference between the

protected speech and adverse employment action is sufficient to support an allegation of a causal

connection strong enough to survive summary judgment."); *Richardson*, 180 F.3d at 446–47

(holding that acts within one month of receipt of deposition notices may be retaliation for

initiation of lawsuit more than one year earlier).

In addition to the evidence of temporal proximity, Plaintiff has offered other circumstantial evidence to support a causal connection between protected activity and the adverse actions by Defendant. Specifically, Plaintiff testified that Javenes went to Plaintiff's home to discuss the pending Article 78 proceeding because he "was concerned about the Article 78 [proceeding]. He didn't see how it was going to benefit the Town or benefit [Plaintiff]." (Pl.'s Dep. 112.) In fact, according to Plaintiff, Javenes, "threatened [Plaintiff's] job if [he] did not drop the case," and that Plaintiff's suit was "only going to make things worse." (Pl.'s Aff. ¶ 18.) In the same vein, Finn publicly displayed antipathy toward Plaintiff's suit against the Town, calling it a "waste of taxpayer money." (Rockland County Times Article.) Finn also conceded that the Town withheld public announcement of the decision to eliminate Plaintiff's position in part because the Town "didn't need any bad press," by which an inference can be made that there may indeed have been a retaliatory motive for the decision. (Finn Dep. 58.)

Thus, the Court concludes that Plaintiff has submitted sufficient circumstantial evidence to create a material issue of fact on the issue of causation. Accordingly, Defendant's Motion is denied on these grounds.

### b. *Monell* Liability

Defendant argues that, irrespective of Plaintiff's prima facie case, the Town is entitled to summary judgment because the Town has proffered sufficient evidence to show that a majority of Town Board members acted with permissible motives in terminating Plaintiff's position. (*See* Def.'s Mem. 14–16.)

The Town does not dispute that it "may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body

unquestionably constitutes an act of official government policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Rather, Defendant contends that the majority of the Town Board did not act with retaliatory motive, and therefore the Town itself cannot be held responsible for any retaliatory actions. Defendant relies almost exclusively on the Second Circuit's decision in *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778 (2d Cir. 2007). There, the Second Circuit reaffirmed prior precedent in holding that, "if a defendant public body (or its members) *proves* that, despite the unconstitutional actions of a minority, a majority based their actions on legitimate grounds, it, or its individual members, may prevail." 507 F.3d at 786 (citing *Coogan v. Smyers*, 134 F.3d 479, 485-86 (2d Cir. 1998) and *Jeffries v. Harleston*, 52 F.3d 9, 14 (2d Cir. 1995)). The court noted further that "it is possible that, even if a majority of the individuals that participate in the decision lack unconstitutional motives, the unconstitutional intentions of a minority of those involved can taint the ultimate outcome." *Id.*; *see also Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 125-26 (2d Cir. 2004) ("[I]t is clear that impermissible bias of a single individual at any stage of the . . . process may taint the ultimate employment decision even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the process." (alterations and internal quotation marks omitted)).

In making this argument, the Town relies on the assertion that the Town Board members were motivated by the "potential economic benefits to the Town by eliminating [Plaintiff's] position," and their belief that the outside firm "would be better equipped to work on the . . . waste-to-biofuels plant in the Town." (Def.'s Mem. 15.) Defendant generally asserts that "[t]here is no evidence whatsoever that any Board member's vote was influenced or motivated at all due to a desire to retaliate against Plaintiff for: (1) appealing to the ZBA, (2) commencing an

Article 78 proceeding, (3) prevailing on the Article 78, or (4) requesting that the ZBA reinstate his appeal." (*Id.*) However, there are disputes in the record on this point. For example, Plaintiff's position was never discussed in a public meeting of the Town Board, and the discussions regarding costs savings were done at a very general level. (*See* Oct. 28, 2014 Board Meeting Recording 2:18:10; Nov. 12, 2014 Board Meeting Recording 1:26:30, 1:30:45–1:32:00.) Further, there is evidence in the record that at least two members of the Town Board—Finn and Javenes—may have been motivated by Plaintiff's ZBA appeal and the commencement of an Article 78 proceeding. Finn is quoted as stating that Plaintiff's action was a "waste of taxpayer money," (Rockland County Times Article), and that he generally feared "bad press" associated with terminating Plaintiff, (Finn Dep. 58). Javenes is alleged to have "threatened [Plaintiff's] job if [he] did not drop the case," (Pl.'s Aff. ¶ 18), and, as previously discussed, noted that "[h]e didn't see how it was going to benefit the Town or benefit [Plaintiff]," (Pl.'s Dep. 112). Finn's possible motivations are particularly important under the circumstances, as Finn was the Town Supervisor at the time, and, according to at least one member of the Town Board, "was spearheading the effort or presenting the effort to have the position eliminated and hire the outside firm," (Javenes Dep. 23). Indeed, Finn was in charge of soliciting bids from outside firms and presenting the bids to the Town Board, (*see* Finn Dep. 56–57), and was the sole member of the Town Board who was present for each meeting with prospective firms, (*see* Finn Dep. 72). The possibility of Finn's "impermissible bias," based on reasonable inferences in Plaintiff's favor, would allow for a reasonable jury to believe his bias "infected the overall decisionmaking process," because of his influence over the decision to replace Plaintiff with an outside vendor. *Cine SK8, Inc.*, 507 F.3d at 786 n.4 (internal quotation marks omitted).

In any event, Defendant's evidence that the Town Board was motivated by potential cost

savings does not preclude a finding that Town Board *also* acted with impermissible motives or was otherwise influenced in its actions. This is particularly true given that the Town Board members were well aware of Plaintiff's pending litigation. Indeed, the full Town Board voted unanimously to hire outside counsel to defend the Town against Plaintiff's suit. (*See* Article 78 Resolution.) Accordingly, the Court denies Defendant's Motion on these grounds.

### c. Rebuttal of Prima Facie Case

A defendant may rebut a prima facie showing of retaliation by demonstrating that, that, "even if there is evidence that the adverse employment action was motivated in part by the protected speech, . . . it would have taken the same adverse action in the absence of the protected speech." *Anemone*, 629 F.3d at 114 (internal quotation marks omitted). "The constitutional principle at stake, [i.e., freedom from retaliation for protected speech,] is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the protected conduct." *Id.* at 115 (alteration omitted) (quoting *Mount Healthy*, 429 U.S. at 285–86).

The Court cannot find, as a matter of law, that Defendant would have made the decision to eliminate Plaintiff's position in the absence of his initial complaint to the ZBA and/or the ongoing Article 78 proceeding against the Town so as to entitle Defendant to summary judgment. There are multiple issues of material fact, discussed earlier, on the issue of causation that the Court will not repeat here. These issues also preclude summary judgment on the issue of whether Defendant would have eliminated the Town Engineer position in the absence of Plaintiff's protected speech. *See Caruso v. City of New York*, 973 F. Supp. 2d 430, 457 (S.D.N.Y. 2013) (holding that while there was "credible evidence in the record to support" the defendants' arguments regarding permissible reasons for termination, the "disentangle[ment] [of] the permissible from the impermissible reasons for a plaintiff's termination" is a task reserved for

the jury (alterations and internal quotation marks omitted)); *Frisenda*, 775 F. Supp. 2d at 516 (noting that issues of material fact that create a dispute as to causation also create a dispute as to alternative motivations for the adverse action). Specifically, there is evidence in the record from which a jury could infer that the final decision was made *after* Plaintiff prevailed in his Article 78 proceeding, or after he attempted to reinstate his complaint before the Town on January 7, 2015. As noted, Plaintiff was terminated six days after he attempted to restart the litigation process with regard to his initial complaint, (Conway Jan. 7, 2015 Letter; Town Engineer Resolution), and there is no evidence as to when the Town Board ultimately chose to *retain* Lanc & Tully; instead, Defendant merely submits Lanc & Tully's December 3, 2014 proposal, (Lanc & Tully Dec. 3, 2014 Letter). It may be that the decision was made only after Lanc & Tully submitted its proposal, or it may be that the Town Board was spurred to action by Plaintiff's January 7, 2015 letter in the wake of the Rockland County Supreme Court's decision on his Article 78 petition. Further, as previously discussed, the timeline could be reasonably interpreted such that the Town's initial cost savings discussions on October 28, 2014 were actually spurred by the filing of the Article 78 proceeding in March 2014, and advanced based on the ongoing nature of the litigation and the Rockland County Supreme Court's ultimate decision in Plaintiff's suit on October 31, 2014. However, "the weighing of the evidence[] and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," and thus summary judgment is inappropriate. *Manganiello v. City of New York,* 612 F.3d 149, 161 (2d Cir. 2010) (internal quotation marks omitted).

Moreover, although it is undoubtedly true that the Town Board held multiple discussions regarding cost-cutting measures that could be taken by the Town, it is similarly the case that the Town Board *never* specifically discussed eliminating the Town Engineer position at *any* public

meeting for cost savings purposes.  (Oct. 28, 2014 Board Meeting Recording 2:18:10; Nov. 12, 2014 Board Meeting Recording 1:26:30, 1:30:45–1:32:00.)  In fact, no other position except for the Town Engineer has been eliminated since January 2015 as a cost savings measure.  (*See* Basile Dep. 38.)  A jury could reasonably credit Defendant's argument and conclude that Defendant was motivated exclusively by a desire to save money in replacing Plaintiff with Lanc & Tully.  However, there is credible evidence in the record that the Town had ulterior, impermissible motives in singling out *Plaintiff*, as opposed to cutting costs by outsourcing his position *along with* others.  Ultimately, "it is for a jury to attempt to disentangle the permissible from the impermissible reasons for [Plaintiff's] termination, not this Court."  *Caruso*, 973 F. Supp. 2d at 457 (alteration and internal quotation marks omitted).  Thus, considering the entirety of the record and the context of this Action, and drawing all reasonable inferences in favor of Plaintiff, the Court concludes that the record contains genuine issues of material fact that defeat Defendant's Motion on the issue of whether Defendant would have eliminated Plaintiff's position regardless of any retaliatory motive.

### 2.  New York Civil Service Law § 75-b Claim

Defendant also moves for summary judgment on Plaintiff's whistleblower and retaliation claims brought under New York Civil Service Law § 75-b.  (Def.'s Mem. 17–20.)  Section 75-b prohibits a public employer in New York State from taking adverse personnel action against a public employee in retaliation for the employee's disclosure of illegal activity.  N.Y. Civ. Serv. Law § 75-b.  To assert a claim under § 75-b, a plaintiff must allege:

> (1) an adverse personnel action; (2) disclosure of information to a governmental body (a) regarding a violation of a law, rule, or regulation that endangers public health or safety, or (b) which []he reasonably believes constitutes an improper governmental action; and (3) a causal connection between the disclosure and the adverse personnel action."

*Morales v. City of New York*, No. 14-CV-7253, 2016 WL 9651130, at *7 (S.D.N.Y. Aug. 9, 2016) (internal quotation marks omitted).  Defendant argues that Plaintiff's whistleblower claim fails because he "did not reasonably believe that the Building Inspector violated a federal, state or local law, rule or regulation."  (Def.'s Mem. 19.)  Plaintiff's Complaint states that "[t]he Town Building Inspector [] wrongfully rescinded and/or withdrew a violation by a property owner[] in the Town of Stony Point, relating to Chapter 215, Article IV, Section 23 C of the . . . Town Code," and that "[s]aid rescission and/or withdrawal, by the Building Inspector, of the aforementioned violation, was in violation of the Defendant's policy, rules, regulations and procedures including the New York State Zoning Enforcement Procedures including the James A. Coon Local Government Technical Series, Zoning Enforcement."  (Compl. ¶¶ 9–10.) Defendant is correct that the James A. Coon Local Government Technical Series, Zoning Enforcement ("Coon Series") is not "a federal, state or local law, rule or regulation, " and is instead merely guidance that "discusses the zoning enforcement process, including options for enforcement, along with the laws that authorize enforcement in the towns and villages of New York State."  (Randazzo Decl. Ex. I ("2011 Coon Series") 1.)  To be sure, the Coon Series states that "[i]t does not contain specific information regarding zoning enforcement in cities."  (*Id.*) Moreover, Plaintiff does not allege that the Building Inspector violated Chapter 215, Article IV, Section 23 C of the Town Code, but rather that he "rescinded and/or withdrew a violation by a property[] owner . . . relating to Chapter 215, Article IV, Section 23 C of the . . . Town Code." (Compl. ¶ 9.)  The violation of the Town Code is alleged to have been committed by Erich and Kimberly Vonheim, not by any Town employee.  (*See* Pl.'s ZBA Appeal; Randazzo Decl. Ex. K ("Town Code § 215-23") (stating, in relevant part, that "the limbs or foliage on any tree [shall

not] obstruct vision or be permitted to grow nearer to the ground than eight feet where such limbs or foliage overhang or are over or upon land [as shown in the Town Code]").)

Nevertheless, Plaintiff may have "reasonably believe[d]" that the Building Inspector's decision "constitute[d] an improper governmental action," *Morales*, 2016 WL 9651130, at *7 (internal quotation marks omitted), as Plaintiff believed that Sheehan rescinded the Notice of Violation before the violation itself had been cured, thus endangering public health or safety. To that end, Plaintiff testified that Sheehan failed to "mak[e] sure that the issue [was] corrected and in conformance with the code," as "the work that was done was not sufficient to remove the hazard." (Pl.'s Dep. 120–21.) In fact, Monaghan testified that, based on his prior experience as a bus driver in the Town, he *agreed* with Plaintiff that the trees constituted a hazard, stating that "when I heard the story of the bushes, I agreed with it," and that "any time there's bushes like that when you pull out, I would consider that an unsafe condition." (Randazzo Decl. Ex. W ("Monaghan Dep.") 19–20.) Accordingly, the Court cannot state at this stage, as a matter of law, that Plaintiff's belief as to the propriety of Sheehan's governmental action was inherently unreasonable.

The Court further finds that Plaintiff has satisfied the causation prong under § 75-b for the reasons stated in the analysis of Plaintiff's First Amendment claim. Plaintiff relies upon the temporal proximity of the actions, as well as other circumstantial evidence discussed earlier, and "[t]he Court thus finds that a reasonable factfinder could infer causation" in light of the entirety of the record. *Payson v. Bd. of Educ. of Mount Pleasant Cottage Sch., USFD*, No. 14-CV-9696, 2017 WL 4221455, at *27 (S.D.N.Y. Sept. 20, 2017) (finding that the causal connection prong of a § 75-b claim can be satisfied at the summary judgment stage when the plaintiff relies solely on temporal proximity). Defendant's argument that so long as there is "any legitimate independent

basis for terminating . . . Plaintiff, . . . the Town is entitled to summary judgment on Plaintiff's § 75-b claim," (Def.'s Mem. 20), is misplaced. "[T]his argument is inconsistent with § 75-b's remedial purpose and contravenes § 75-b's federal counterparts." *Jones v. Town of Whitehall*, No. 13-CV-0806, 2015 WL 4603511, at \*9 (N.D.N.Y. July 30, 2015); *see also In re Kowaleski*, 942 N.E.2d 291, 295 (N.Y. 2010) ("In order to be effective, whistleblower protections like those embodied in Civil Service Law § 75-b must shield employees from being retaliated against by an employer's selective application of theoretically neutral rules. Thus, a separate determination regarding the employer's motivation in bringing the action is necessary if section 75-b is to truly establish a major right for employees—the right to speak out against dangerous or harmful employer practices." (alteration and internal quotation marks omitted)).

Accordingly, Defendant's Motion To Dismiss Plaintiff's § 75-b claim is denied.

### III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is denied. The Court will hold a status conference on November 13, 2018 at 10:00 am. The Clerk of Court is respectfully directed to terminate the pending Motion. (*See* Dkt. No. 21.)

SO ORDERED.

Dated: September 28, 2018
White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE